IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| FLEET FEET, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:19-CV-885 |
| | ) | |
| NIKE INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Catherine C. Eagles, District Judge.

The plaintiff Fleet Feet, Inc., has used two trademarks, "Change Everything" and "Running Changes Everything," for a number of years in connection with selling running shoes and other athletic apparel and with organizing running and walking races, training, and related events.  This summer, the defendants Nike, Inc., Nike USA, Inc., and Nike Retail Services, Inc. ("Nike"), began to use the phrase "Sport Changes Everything" in a large-scale and ubiquitous advertising campaign expected to last through the holidays and into the New Year.  Because Fleet Feet has demonstrated a likelihood of success on the merits of its trademark infringement claims and met the other requirements for a preliminary injunction, Fleet Feet's motion will be granted.

## Overview

To obtain a preliminary injunction, a party must show that:  (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm if the injunctive relief is denied, (3) the balance of equities tips in its favor, and (4) injunctive relief would be in

the public interest. *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008).

"Satisfying these four factors is a high bar, as it should be." *SAS Inst., Inc. v. World Programming Ltd*., 874 F.3d 370, 385 (4th Cir. 2017), *cert. denied*, 139 S. Ct. 67 (2018).

To show a likelihood of success on the merits of its trademark infringement claims, Fleet Feet must make a strong case that Nike is infringing Fleet Feet's marks.[1] This requires proof that Fleet Feet owns a valid, protectable trademark and that Nike's use of the mark is likely to cause confusion among consumers.[2] *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc.*, 43 F.3d 922, 930 (4th Cir. 1995).

Fleet Feet offers significant evidence that it owns valid marks: the United States Patent and Trademark Office (USPTO) has recognized the validity of the "Change Everything" mark by registering it on the Principal Register, which is prima facie

---

[1] Fleet Feet seeks a preliminary injunction based on its first three claims: trademark infringement in violation of 15 U.S.C. § 1114 (Lanham Act), unfair competition and false advertising in violation of 15 U.S.C. § 1125 (same), and state common-law trademark infringement and unfair competition. Doc. 9 at 15. These claims require proof of the same elements. *See Ga. Pac. Consumer Prods., LP v. Von Drehle Corp.*, 618 F.3d 441, 449 (4th Cir. 2010) ("the tests for trademark infringement and unfair competition under the Lanham Act are essentially the same as that for common law unfair competition under North Carolina common law"); *Lamparello v. Falwell*, 420 F.3d 309, 312–13 (4th Cir. 2005) (listing elements, same for § 1114 and § 1125).

[2] In addition to the two elements listed in the text, Fleet Feet must also show that Nike is using the mark in commerce and without authorization and that Nike is using the mark, or an imitation of it, "in connection with the sale, offering for sale, distribution, or advertising" of goods or services. *Lamparello*, 420 F.3d at 313. "Sport Changes Everything" is prominently displayed in Nike's online and brick-and-mortar stores, *infra* at ¶¶ 30, 33, and Fleet Feet sent a cease-and-desist letter soon after discovering the campaign. *Infra* at ¶ 36. Nike does not contest Fleet Feet has met its burden on these two elements. Doc. 34; *see Rebel Debutante LLC v. Forsythe Cosmetic Grp., Ltd.*, 799 F. Supp. 2d 558, 569–70 (M.D.N.C. 2011) (evidence of defendant's advertisements and product displays showed use of the mark in commerce, and pre-litigation letters between the parties indicated lack of authorization to use the mark).

evidence of the validity of that mark, and Fleet Feet has used both marks for several years in connection with retail and online sales, training, and races. The evidence of reverse confusion—which occurs when the junior user's advertising and promotion overcomes the senior user's reputation in the market such that customers are likely to be confused into thinking that the senior user's goods are those of the junior user, 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 23:10 (5th ed. 2019)—is substantial, as Nike is spending millions of dollars to intensely promote the "Sport Changes Everything" campaign.

Nike challenges validity, contending that both "Change Everything" and "Running Changes Everything" are in common use and cannot be trademarked and that Fleet Feet does not use either phrase "as a trademark." It also challenges Fleet Feet's evidence of confusion and asserts the affirmative defense of fair use, which if shown would ultimately defeat any liability.

The Court, having reviewed the motions, the supporting documents, all matters of record,[3] and the briefing, makes the following findings of fact and conclusions of law for the purpose of this Order only.

---

[3] The Court has not considered Nike's motion at Doc. 62 as part of its decision on the pending motion. Nike was given a full opportunity to be heard, both in briefing and at oral argument, before the Court indicated its decision when it asked for the parties' views on the specific language of the injunction. *See, e.g.*, *Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 167 (2d Cir. 2003) ("Where litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again."). The Court omits internal citations, alterations, and quotation marks throughout this opinion, unless otherwise noted. *See United States v. Marshall*, 872 F.3d 213, 217 n.6 (4th Cir. 2017).

## Findings of Fact

**The Parties**

1. Fleet Feet, through franchised, company-owned, and online stores, sells running and fitness merchandise, including footwear, apparel, accessories, and general fitness products, as well as training programs and related services. Doc. 10 at ¶ 9. As part of this business, Fleet Feet and its franchisees organize races, running groups, and training events. Doc. 10-3. Its primary focus is running gear, which is used by athletes from many sports as part of a fitness regimen. Doc. 47 at ¶ 6.

2. Fleet Feet has 182 stores, including franchises, nationwide. Doc. 10 at ¶ 8.

3. Since Sept. 1, 2014, Fleet Feet has spent approximately $1,900,000 on advertising and marketing its brand, not including what franchised stores may have spent; $800,000 on advertising and marketing by its company-owned locations; and $1,350,000 on digital media advertising by its online store. *Id.* at ¶ 20. The record does not reflect how much of that spending was dedicated to or used the "Change Everything" mark or the "Running Changes Everything" mark.

4. From Sept. 1, 2014, to Aug. 31, 2019, Fleet Feet's franchisees and affiliates earned more than $940,000,000 in revenue, resulting in more than $25,000,000 in royalties and license fees paid to Fleet Feet. *Id.* at ¶ 21.

5. Nike is in the business of designing, developing, marketing, and selling athletic footwear, apparel, equipment, accessories, and services. Doc. 15-1 at 2. It is the largest seller of athletic footwear and apparel in the world. *Id.*

6. Nike's consolidated gross profit in fiscal year 2019 was $17,474,000,000, a 10% increase over the previous year, *id.* at 6, and it spends many millions of dollars on "demand creation expense," *id.*, which the Court infers means the money was spent on various forms of advertising

7. Nike focuses primarily on six product categories: running, Basketball, the Jordan Brand, soccer, training, and sportswear/ lifestyle products. *Id.* at 2. It also makes products for children and for other sports. *Id*. Nike's product lines include but are not limited to Fleet Feet's specialty.

8. Fleet Feet sells shoes and other athletic wear made by several different companies, including Nike. *See* Doc. 10-2. Nike sells its products both directly, through Nike-owned retail stores and online, and through businesses like Fleet Feet. Doc. 15-1 at 2–3. Nike's relationship with Fleet Feet is longstanding. Fleet Feet is thus both Nike's customer and Nike's competitor.

**Fleet Feet's Trademarks at Issue**

9. Fleet Feet has trademark rights in two phrases, "Change Everything" and "Running Changes Everything," when used in connection with retail sporting goods stores, organizing running and walking race training events, or athletic shirts. Its rights to "Change Everything" arise from use under the common law, *see infra* at ¶¶ 10–12, and from registration on the Principal Register on October 13, 2015. *See infra* at ¶ 14; Doc. 7-1. Its rights to "Running Changes Everything" arise from use under the common law. *See infra* at ¶¶ 18–20.

**The "Change Everything" Mark**

10. Fleet Feet began using the phrase "Change Everything" (CE) in June 2013 for its retail stores and for race and training events and in August 2014 for apparel.[4] Fleet Feet has used it continuously since.[5]

11. Fleet Feet uses "Change Everything" in a variety of ways, including on athletic shirts given away or sold as part of races or for training events,[6] in online and in-store advertising,[7] on promotional items such as referral cards[8] and materials for industry conferences,[9] and on in-store displays.[10]  It is generally displayed alone, rather than textually in a sentence; for example, the phrase may be centered and without other adjacent text on T-shirts, or used as a banner headline on the website.  *See supra* notes 6–10.  Occasionally, CE is used in a more textual way.  *See, e.g.*, Doc. 38-13 at 2; Doc. 38-15 at 2.

---

[4] Doc. 7 at ¶ 20; Doc. 7-1 (first use for stores and training events June 24, 2013); Doc. 7-2 (first use for apparel Aug. 31, 2014).

[5] *See, e.g.*, Doc. 10-12 (Fleet Feet website advertising running programs for Dec. 29, 2014, spring 2016, and fall 2019); Doc. 48-10 at 188 (Fleet Feet website with "Latest News" dated Aug. 6, 2013), 190 (Fleet Feet website indicating an upcoming informational session in June 2019).

[6] Doc. 7-3 at 19–20, 23; Doc. 10-9 at 8–12; Doc. 10-29; Doc. 46-1 at 2.

[7] Doc. 7-3 at 21–24, Doc. 7-11 at 6–10, Doc. 10-12 (online); Doc. 12-3 at 2 (in-store).

[8] Doc. 10-13.

[9] Doc. 12-1.

[10] Doc. 10-9 at 5.

12. Fleet Feet generally uses an all-caps, non-italicized block font, similar to its company name.[11]  On T-shirts, in stores, online, and in social media, the CE mark is typically displayed next to, or on the other side of the T-shirt from, another Fleet Feet mark, such as the company name or "flame" symbol.[12]  Fleet Feet has not generally featured stories about individuals in using this mark, but where it has, it has generally used photographs rather than video.  *See, e.g.*, Doc. 38-15 ("latest news" posting on Fleet Feet website of running program participants' successful completion of 5K race, featuring RCE and CE marks).  Fleet Feet and its licensees do use video advertisements online to promote their training programs; the three examples provided[13] have some 15,400 views total.  Doc. 10 at ¶¶ 40–42.

13. In August 2014, Fleet Feet applied to the USPTO to register "Change Everything" as a trademark for three categories of use, called International Classes:  retail sporting goods stores (Class 35), organizing running and walking race training events (Class 41), and athletic apparel (Class 25).  *See* Doc. 38-23 at 17.[14]

14. On October 13, 2015, the USPTO placed the "Change Everything" mark on the Principal Register for Classes 35 and 41, retail sporting goods stores and

---

[11] *See, e.g.*, Doc. 7-3 at 18 (CE, T-shirt), 21 (CE, training program), 22 (CE, website).

[12] *See, e.g.*, Doc. 7-11 at 7–10 (CE on advertisement for training program, with company name), Doc. 10-9 at 3, 9 (CE and RCE on T-shirts, with company name).

[13] One video displays the CE mark on athletic T-shirts worn by post-race runners, and the other two display CE and RCE as still shots without surrounding text.

[14] The original trademark application is not part of the record, but various other documents confirm the application date.

organizing running and walking race training events, Doc. 7-1, and on the Supplemental Register for Class 25, athletic apparel. Doc. 7-2. The mark "consists of standard characters without claim to any particular font, style, size, or color." Docs. 7-1, 7-2.

15. On Sept. 17, 2019, Fleet Feet applied to register its CE mark for athletic apparel (Class 25) on the Principal Register and sought other changes not raised as relevant here. Doc. 7-3 at 3–4. In response, the USPTO, *inter alia*, approved the mark for publication on the Principal Register for Class 25, Doc. 48-10 at 5–8, 11, which gives notice of and opportunity to object to the potential change to the public and which precedes actual registration.[15]

16. Nike has filed with the USPTO petitions for cancellation of the CE mark in all three classes. Docs. 38-22, 38-23; *see* Doc. 44-1. Fleet Feet has since asked that the Principal Register entry for CE in Class 25 be limited to shirts, rather than all apparel. Doc. 48-12.

17. At the moment, the CE mark is on the Supplemental Register for athletic apparel and on the Principal Register for retail sporting goods stores and organizing running and walking race training events. *See supra ¶* 14.

---

[15] Once approved for publication on the Principal Register, the mark must then be published in the *Trademark Official Gazette* for 30 days to allow any party who believes it will be damaged by the mark's registration to file a notice of opposition with the Trademark Trial and Appeal Board; if no objection, the mark will be registered. Doc. 48-5 at 4.

**The "Running Changes Everything" Mark**

18. In February 2009, Fleet Feet used the phrase "Running Changes Everything" (RCE) in a print advertisement, Doc. 7-11 at 2–3, and the following month, in an advertisement in the magazine *Runner's World*. Doc. 10-6 at 5. Since then, Fleet Feet has consistently used RCE across multiple media and in a way that stands out to the consumer. *See infra* at ¶¶ 19–20.

19. Specifically, Fleet Feet uses "Running Changes Everything" in its print advertising[16] and materials for industry conferences,[17] gift card holders,[18] its website[19] and social media,[20] its Fleet Feet-branded T-shirts[21] and van,[22] its brick-and-mortar stores,[23] and at training events and races.[24] The phrase is typically displayed alone, rather than used textually in a sentence. For example, it is used as a banner headline superimposed over photographs on the website, centered and

---

[16] Doc. 10-6.

[17] Doc. 10-27.

[18] Doc. 7-12 at 5–6.

[19] Doc. 10-7.

[20] Docs. 10-8, 10-10, 10-14; Doc. 48-10 at 104.

[21] Doc. 10-9; Doc. 7-9 at 2–4; Doc. 48-10 at 104.

[22] Doc. 10-11.

[23] Doc. 7-8.

[24] Doc. 10-11 at 3.

without other adjacent text on T-shirts, and on a large sign over a store display. *See supra* notes 16–24.  Occasionally, RCE is used in a more textual way.  *See, e.g.*, Doc. 38-10 at 3, Doc. 38-11 at 2, Doc. 38-12 at 2.

20. As with the "Change Everything" mark, *see supra* at ¶ 12, Fleet Feet generally uses an all-caps, non-italicized block font, similar to its company name, for the "Running Changes Everything" mark,[25] though it also uses an all-caps handwriting font on some T-shirt designs and its website.[26]  On T-shirts, in stores, online, and in social media, the RCE mark is typically displayed next to (or on the other side of the T-shirt from) another Fleet Feet mark, such as the company name or "flame" symbol.[27]  As noted *supra* at ¶ 12, Fleet Feet has not often featured stories about individuals in using these marks, but where it has, it has generally used photographs rather than video.

21. Fleet Feet has offered no evidence that it uses either mark on its product labels or hangtags, and the Court infers and finds that it does not.

22. On July 10, 2019, Fleet Feet applied to register its trademark for "Running Changes Everything" on the Principal Register for Class 35 (retail sporting goods); the claimed mark "consist(s) of standard characters, without claim to any

---

[25] *See, e.g.*, Doc. 7-4 at 9 (RCE, T-shirt); Doc. 7-7 (RCE, website); Doc. 7-8 (RCE, store).

[26] Doc. 7-4 at 10 (Fleet Feet website); Doc. 10-9 at 2–3 (T-shirt); Doc. 46-1 at 3, 6 (T-shirt).

[27] *See, e.g.*, Doc. 7-11 at 4 (RCE on website, near company name and "flame"), 11–13 (RCE on twitter post, with company name and "flame"); Doc. 7-12 at 3 (RCE on brochure, with company name and "flame"); Doc. 10-9 at 3, 9 (CE and RCE on T-shirts, with company name); Doc. 7-4 at 8 (RCE in store, with company name).

particular font style, size, or color." Doc. 7-4 at 5. Fleet Feet asserted that RCE had acquired distinctiveness, i.e., secondary meaning,[28] based on five or more years' use. Doc. 7-4 at 2–3 (first used Mar. 28, 2012).

23. On Aug. 8, 2019, Fleet Feet applied to register "Running Changes Everything" on the Principal Register for Classes 25 (apparel) and 41 (training events). Doc. 7-5 at 2–6. As with its July 2019 application, *supra* ¶ 22, it did not claim a particular font style and asserted the phrase had acquired distinctiveness since its first use on March 28, 2012. *Id.*

24. On July 30, 2019, the USPTO issued a "nonfinal office action" for Fleet Feet's "Running Changes Everything" application for retail sporting goods (Class 35), stating that "the mark appears to be inherently distinctive and is eligible for registration on the Principal Register without proof of acquired distinctiveness." Doc. 15-2 at 2–3. The USPTO gave Fleet Feet the option to withdraw the claim of acquired distinctiveness. *Id.* According to Fleet Feet's counsel at oral argument, Fleet Feet did so, but the Court did not locate record support for that assertion.

---

[28] Section 2(f) of the Lanham Act provides that, unless expressly excluded, "nothing in this chapter shall prevent the registration of a mark used by the applicant which has become distinctive of the applicant's goods in commerce. The [USPTO] Director may accept as prima facie evidence that the mark has become distinctive, as used on or in connection with the applicant's goods in commerce, proof of substantially exclusive and continuous use thereof as a mark by the applicant in commerce for the five years before the date on which the claim of distinctiveness is made." 15 U.S.C. § 1052(f). *See* discussion *infra*.

25. After this notice, Fleet Feet submitted another application for the Principal Register for Class 35 for a different use—by and for franchisees—without claiming acquired distinctiveness.  Doc. 7-6 at 3–4; Doc. 48-5 at 6–7.

26. On Oct. 23, 2019, the USPTO approved Fleet Feet's RCE mark for publication on the Principal Register for Classes 25, 35, and 41.  Docs. 48-6, 48-7, 48-8.  As noted *supra* at ¶ 15, publication gives notice to the public, and approval for publication does not constitute registration.

**Nike's Use of "Sport Changes Everything"**

27. In May 2019, Nike began to design an advertising campaign around the phrase "Sport Changes Everything."  Doc. 37 at ¶ 8.

28. None of the people on the Nike creative team who developed the "Sport Changes Everything" campaign worked with Fleet Feet or were familiar with Fleet Feet's "Change Everything" and "Running Changes Everything" marks.  Doc. 35 at ¶¶ 3–4; Doc. 37 at ¶¶ 3–4.  But numerous Nike employees in its running sales group were familiar with and knew about Fleet Feet's use of CE and RCE as marks.  *See, e.g.*, Doc. 36 at ¶ 9; Doc. 7 at ¶¶ 40–42; Doc. 7-13; Doc. 22 at ¶ 41; Doc. 10 at ¶ 32; Doc. 10-17.  Nike has presented no evidence as to whether it did or did not do a trademark search before beginning to use the SCE phrase.  From this silence and Nike's level of business sophistication generally and as to trademarks

specifically,[29] the Court infers and finds for purposes of this motion that Nike did

do such a search and was aware of Fleet Feet's "Change Everything" mark.

29. The "Sport Changes Everything" campaign is directed towards multiple sports.[30]

Usually the SCE phrase is accompanied by a Nike trademark, such as the Nike

"swoosh" or the Nike name,[31] but not always.[32] Nike sometimes uses the SCE

phrase in a discrete way similar to its mark "Just Do It."[33]

---

[29] The Court takes judicial notice that Nike has been involved in many lawsuits over trademarks, both in efforts to enforce its own rights and as a defendant. *See, e.g.*, *Nike, Inc. v. Just Did It Enters.*, 6 F.3d 1225 (7th Cir. 1993); *Bauer Bros., LLC v. Nike, Inc.*, 159 F. Supp. 3d 1202 (S.D. Cal. 2016); *Fuel Clothing Co. v. Nike, Inc.*, 7 F. Supp. 3d 594 (D.S.C. 2014); *Nike Inc. v. Variety Wholesalers, Inc.*, 274 F. Supp. 2d 1352 (S.D. Ga. 2003), *aff'd,* 107 F. App'x 183 (11th Cir. 2004).

[30] *See, e.g.*, Doc. 10-21 at 2 (Chantel Navarro, boxing), 4 (Nayeli Rivera, soccer), 7 (NY vs. NY Womens [*sic*] Tournament, basketball), 11 (Madison's letter to Serena Williams, tennis), 12 (Lane Tech Football).

[31] *See* Doc. 7-16 at 2 (Chicago mural with "swoosh"); Doc. 7-21 at 4, Doc. 7-22 at 2–3 (in-store display with "swoosh"); Doc. 10-21 at 2 (Nike videos with Nike name and "swoosh"); Doc. 10-24 (pop-up races with Nike name and "swoosh").

[32] *See, e.g.*, Doc. 7-22 at 2 (two in-store installations, one with "swoosh" and one without); Doc. 46 at ¶ 13, Doc. 46-7 (Instagram post from Nike workout party, with photo in front of SCE display lacking a visible Nike mark).

[33] *Compare* Doc. 46-5 at 6–7 ("Just Do It" as Nike twitter profile header image) *with* Doc. 46-5 at 11 (SCE as same); *compare* Doc. 46-5 at 2–3 (large "Just Do It" billboards in Los Angeles) *with* Doc. 46-5 at 8–9 (large SCE billboards in Chicago and New York).

30. The SCE campaign involves placement of the phrase in advertisements online[34] and on television,[35] in social media posts (including as hashtags),[36] in videos posted on YouTube and other websites,[37] on billboards,[38] in stores,[39] and at large[40] and small-scale[41] sporting events.  Doc. 35 at ¶¶ 9–11, 13.  Many of these uses include endorsements by accomplished athletes.  *See, e.g.*, Doc. 10-25.

31. The "Sport Changes Everything" campaign began in July 2019.   Doc. 35 at ¶ 6.  Nike intends to use it through the holiday season, *id.*, and the campaign will culminate at the Super Bowl in early February next year.  Doc. 31 at ¶ 6; Doc. 32 at ¶ 5.  Nike has already spent over $16,000,000 on the SCE campaign.  Doc. 31 at ¶ 16.

32. The SCE campaign began with televised commercials during the July 9, 2019, Major League Baseball All-Star Game and the July 2019 ESPY Awards, and with videos posted on YouTube.  Doc. 35 at ¶ 6, Doc. 37-1 at 4 (ESPY Awards); Doc.

---

[34] Docs. 10-19, 10-23.

[35] Doc. 7 at ¶ 44; Doc. 7-15.

[36] Docs. 10-25, 35-2, 46-9 (social media by Nike-sponsored athletes, including runners, with RCE and SCE); Doc. 46-5 at 11 (Nike twitter profile header image); Docs. 10-21, 35-1 (hashtag "#SportChangesEverything" displayed with each of Nike's videos posted on YouTube).

[37] Docs. 10-21, 35-1.

[38] Doc. 7-16; Doc. 37-1 at 8; Doc. 46-5 at 9.

[39] Doc. 7-22 at 2–3; Docs. 11-1, 11-2, 11-3, 11-4.

[40] Doc. 7-15 (Major League Baseball All-Star Game commercial).

[41] Doc. 10-24 (pop-up races); Doc. 35-4 at 5 ("Go Play Day"), 7 (pop-up races).

7-15 (commercial); Doc. 10-21 (videos).  As of Oct. 25, 2019, Nike had posted 31

videos online as part of this campaign, featuring stories of individual athletes,

which have been viewed over 18.5 million times.  Doc. 46 at ¶¶ 4–5.  At least

three of these videos feature running.  *Id.* at ¶¶ 5–6.  In the videos, Nike uses the

"Sport Changes Everything" phrase in a title and a hashtag viewable on the

website while the video plays (e.g. "Sport Changes Everything: Justin Gallegos,"

and #SportChangesEverything) and as a still shot, with no other text on the screen,

at the end of the video.

33. Nike displays the phrase "Sport Changes Everything" on various social media

posts in multiple fonts akin to handwriting.  *See* Doc. 35-2.  Its in-store displays

use one font of all-caps, forward-slanting handwriting, *see* Docs. 11-1, 11-2, 11-3,

11-4, similar to some of Fleet Feet's uses of its RCE mark.  *See, e.g.*, Doc. 7-4 at

10 (Fleet Feet website); Doc. 10-9 at 2–3 (T-shirt); Doc. 46-1 at 3, 6 (T-shirt); *see

also* Doc. 10-20.  Nike's manner of displaying SCE in stores, on its website, and

on apparel is also similar to the way Fleet Feet uses its "Change Everything" and

"Running Changes Everything" marks.[42]

34. Media coverage of the SCE campaign has featured running.  *See, e.g.*, Doc. 46-8

(article noting Nike's revenue goal and associated new product lines, with

---

[42] *Compare* Doc. 7-21 at 3 (SCE sign above athletic shoe display) *with* Doc. 7-8 at 3 (RCE sign above athletic shoe display); *compare* Doc. 10-24 at 2 (SCE superimposed over a photograph of women running) *with* Doc. 7-7 at 2–3 (RCE superimposed over photograph of women running), Doc. 7-11 at 7–10 (CE superimposed over photograph of people running); *compare* Doc. 46-1 at 3 (RCE on T-shirt in upper-case handwriting font) *with* Doc. 46-6 at 2 (SCE on T-shirt in upper-case handwriting font).

photographs of runners including one holding a Nike shoe with "SCE" written on the sole).

35. Nike does not claim trademark rights in the phrase "Sport Changes Everything." Doc. 35 at ¶¶ 7–8; Doc. 37 at ¶ 7.  It is not used on product labels or hangtags. Doc. 35 at ¶ 8; Doc. 37 at ¶ 7.

**Fleet Feet Learns of Nike's SCE Campaign**

36. Fleet Feet became aware of the Nike "Sport Changes Everything" campaign shortly after it began and contacted Nike on Aug. 7, 2019.  Doc. 7-18.  After Nike's response, and after Nike's website briefly used the phrase "Running Changes Everything," Fleet Feet's lawyers sent a cease-and-desist letter to Nike on Aug. 13, 2019.  Doc. 10-18.  The parties engaged in discussions about the SCE campaign.  Doc. 36 at ¶ 11; Doc. 53 at ¶ 3.

37. In response to Fleet Feet's concerns, Nike made some adjustments and "reworked" the SCE campaign for the Chicago and New York City marathons.  Doc. 35 at ¶¶ 15–16.  While Nike's witnesses did not explicitly say so, the Court infers that Nike removed the phrase "Sport Changes Everything" from its advertising used specifically for these two events.  *Id.*; Doc. 37 at ¶¶ 10–13.  The record does not reflect how much these adjustments cost Nike or how long it took to make these adjustments, beyond vague testimony that it took "numerous hours" and "significant financial resources," Doc. 37 at ¶ 12, and was "very expensive."  Doc. 35 at ¶ 16.  Otherwise, Nike continued to use the phrase in a ubiquitous ad

campaign, and it continues to appear in some running-related online advertisements, videos, and social media posts.[43]

**Third-Party Use of the Phrases "Change Everything" and "Running Changes Everything"**

38. Nike commissioned a "trademark research report" by a third party using the search terms "changes everything," "changing everything," "__ changes," and "everything changes." *See* Doc. 38-17. That search, executed on Oct. 4, 2019, indicated extensive third-party trademark registrations in other classes including these phrases, mostly in combination with other words. Doc. 38-17.[44] None of the active registrations contain only the words "change everything" in any order.[45] None of the registered marks included the phrase "running changes everything."

*See generally* Doc. 38-17.

---

[43] *See, e.g.*, Doc. 10-21 at 2 (Justin Gallegos video), 7 (Arielle Avina video), 8 (Leigh Anne Sharek video) (all posted in July and early August but still online, last viewed Nov. 13, 2019); Doc. 7-20 (SCE on Nike website, underneath link to "Nike Running's Latest"); Doc. 46 at ¶¶ 7–8, Doc. 46-3 (SCE used on Nike website to promote running events and with running-related video); Doc. 46-9 (Nike-sponsored athletes Avina and Sharek with Instagram posts featuring SCE from Aug. 15, Aug. 16, and Sept. 2).

[44] Registered uses include "play changes everything" (for a retail company's various types of board games, Class 28), Doc. 38-17 at 42–45; "Vegas changes everything" (for Las Vegas tourism, Class 35), *id.* at 59; "one choice changes everything" (for CVS's drug-related educational programs, Class 41), *id.* at 66; "appreciation changes everything" (for a company's educational services about recognition techniques and creation of recognition and incentive award programs for others, Classes 35 and 41), *id.* at 90–93; "this changes everything" (by two different companies, in Class 6 and Class 10), *id.* at 94–97, and "Invest. Grow. Change Everything." (for charitable services and accepting and administering monetary charitable contributions, Classes 35 and 36), *id.* at 64–65.

[45] *See* Doc. 48 at ¶ 6 (noting the application for "everything changes" is listed as dead); Doc. 38-17 at 24, 27 ("change everything" and "everything changes" were abandoned, and "changing everything" was cancelled).

39. Many of the report's registrations are not currently active: of 230 federal search hits, 129 were canceled, abandoned, or due to be abandoned. Doc. 48 at ¶¶ 4–7. Fourteen of the 103 "alive" registrations are in Class 35 (which designates "advertising and business services," Doc. 38-17 at 8); four of these registrations are for retail stores, but none sell athletic goods or services. Doc. 48 at ¶ 10. Twenty-six of the "alive" references are for Class 41 ("education and entertainment services," Doc. 38-17 at 8), but none pertain to athletic training or racing. Two are in Class 25 ("clothing and footwear," Doc. 38-17 at 7), but neither is in athletic apparel generally or athletic shirts specifically. Doc. 48 at ¶ 8.

40. In addition to the registrations, the phrase "Change Everything" has occasionally been used both alone and in combination with other words for advertising other athletic products, such as an Adidas "Boost" sneaker in 2014 ("Boost Changes Everything," where Boost was the name of a material used in the shoe), a sports cap in 2013 ("First Changes Everything," where the New Era Cap company featured Jackie Robinson as "the quintessential first"), Gatorade in 2018 ("Everything Changes"), and an ESPN campaign for the 2010 England World Cup ("One Game Changes Everything"). Doc. 38 at ¶¶ 2–5. These videos end with or include prominently a still shot of the quoted tag line alone and in large, distinct print.

41. The phrase "Change Everything" has also been used textually at times in writing about athletics and other product areas. Doc. 38 at ¶¶ 19–22. For instance, the Beauty Bank Boot Camp website published an article titled "Home Fitness: How

18

20 Minutes A Day Can Change Everything," Doc. 38-18; the Drees Performance

Training website published an article titled "Keystone Habits: Change One Thing,

Change Everything," Doc. 38-20; and the Play Like A Girl website published an

article called "Why Play? Sport and Physical Activity Can Change Everything For

Girls." Doc. 38-21.

42. There is no evidence that anyone uses or has used the phrase "Running Changes

Everything" as a trademark or to identify goods, and for purposes of this Order the

Court finds it has not been so used.

## Conclusions of Law

As noted *supra*, to obtain a preliminary injunction, a party must show that: (1) it

is likely to succeed on the merits, (2) it is likely to suffer irreparable harm if the

injunctive relief is denied, (3) the balance of equities tips in its favor, and (4) injunctive

relief would be in the public interest. A preliminary injunction is an "extraordinary

remedy involving the exercise of very far-reaching power." *Pashby v. Delia*, 709 F.3d

307, 319 (4th Cir. 2013). In the appropriate case, preliminary injunctions "protect the

status quo" and "prevent irreparable harm during the pendency of a lawsuit ultimately to

preserve the court's ability to render a meaningful judgment on the merits." *In re

Microsoft Corp. Antitrust Litig*., 333 F.3d 517, 525 (4th Cir. 2003), *abrogated on other

grounds by eBay Inc. v. MercExchange, L.L.C*., 547 U.S. 388 (2006).

I.     Likelihood of Success on the Merits

To succeed on the merits, Fleet Feet must prove trademark infringement, which

requires it to show ownership of a valid, protectable trademark and to show that Nike's

use of an allegedly infringing mark is likely to cause confusion among consumers. *Lone Star Steakhouse*, 43 F.3d at 930. Nike also asserts fair use, which as an affirmative defense would defeat any liability.

      a. Validity

          i. Registration status

The trademark statute provides that registration of a mark upon the Principal Register is "prima facie evidence of the validity of the registered mark." 15 U.S.C. § 1057(b). Fleet Feet's "Change Everything" mark is on the Principal Register for use in retail sporting goods stores (Class 35) and organizing running and walking race training events (Class 41), which provides a rebuttable presumption of validity. *George & Co., LLC v. Imagination Entm't Ltd.*, 575 F.3d 383, 391 n.8, 395 (4th Cir. 2009). Absent some evidence rebutting this presumption, then, the likelihood of success as to the validity of a trademark registered on the Principal Register is quite strong, especially given that Fleet Feet uses the "Change Everything" mark as a source identifier. *See MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 341 (4th Cir. 2001).

Here, Nike has offered very little evidence or argument to undermine the validity of the "Change Everything" mark. *See* Doc. 34 at 17–18 (spending one paragraph on validity issue for both marks). Nike does not contest the fact that Fleet Feet's mark is on the Principal Register. Instead, Nike contends that because it has filed petitions for cancellation, Fleet Feet's "rights are far from settled." *Id.* But the mere fact that Nike has filed petitions for cancellation does little to undermine the presumptive validity of the

CE mark, and Nike cites no cases to the contrary. Nike's perfunctory arguments and absence of evidence do not undermine the presumption of validity.

Since "Change Everything" is not yet on the Principal Register for apparel or athletic shirts, and "Running Changes Everything" is not on it for any uses, they do not enjoy the same presumption. But "ownership of a mark is not dependent on registration, and can also flow from prior use." *Dynamic Aviation Grp. Inc. v. Dynamic Int'l Airways, LLC*, No. 5:15-CV-00058, 2016 WL 1247220, at *16 (W.D. Va. Mar. 24, 2016). The CE mark for athletic shirts and the RCE mark may still be valid if each "is proven to perform the job of identification: to identify one source and distinguish it from other sources." *MicroStrategy Inc.*, 245 F.3d at 341. A mark identifies its source when it is "used in such a manner that its nature and function are readily apparent and recognizable without extended analysis or research," based on factors including the frequency, consistency, and duration of use of the mark, and the use of any "constant pattern or design to highlight" the mark, such as a particular font. *Id.* at 341–42.

"Change Everything" for athletic shirts and "Running Changes Everything" for all applied-for uses are both valid marks: they each stand out as a distinct message signaling affiliation with the company. The text consistently appears either in all-caps block print in a font similar to Fleet Feet's company name, or in an all-caps handwriting font—both of which are recognizable across multiple repeated uses. *Supra* at ¶¶ 12, 20. The marks have been used for several years in a reliable way and in several media associated with Fleet Feet and its other marks: in stores, on its website and social media, on athletic T-shirts, and at races and training events. *Supra* at ¶¶ 10–12, 18–20. In fact, most of Fleet

Feet's examples of CE are photographs of runners in athletic T-shirts, which photographs it also uses on its website, social media, or in-store displays. *See supra* notes 6–10.

At oral argument, Nike contended that RCE and CE are not valid trademarks because Fleet Feet does not use them as such in every instance. While Fleet Feet sometimes uses the marks in a textual way, rather than standing out as a signifier of origin, *supra* at ¶¶ 11, 19, Nike has cited no authority in its brief for the proposition that a few textual uses would defeat a far greater number of trademark uses. The authority Nike cited at oral argument, the *MicroStrategy* case, actually supports Fleet Feet's use of RCE and CE as marks; the plaintiff in that case only made "limited, sporadic, and inconsistent use" of the claimed mark, 245 F.3d at 341–43, while Fleet Feet has used the marks at issue here consistently over a period of years.

ii. Distinctiveness

In order to be a valid trademark, the mark must be distinctive. Marks are often classified in categories of generally increasing distinctiveness, from generic, to descriptive, to suggestive, to arbitrary or fanciful. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992); *George & Co.*, 575 F.3d at 393–94. On one end, generic marks cannot be trademarked, *George & Co.*, 575 F.3d at 394, and on the other, suggestive, arbitrary or fanciful marks are inherently distinctive and entitled to protection. *Two Pesos, Inc.*, 505 U.S. at 768. Descriptive marks, in the middle, may be trademarked only if they have acquired distinctiveness, which is called "secondary meaning." *Id.* at 769; *see* 15 U.S.C. § 1052(f) (authorizing trademark registration upon "evidence that the mark has become distinctive"). As suggestive and arbitrary marks are

inherently distinctive, they do not require proof of such secondary meaning. *See George & Co.*, 575 F.3d at 394.

Fleet Feet maintains that "Change Everything" is arbitrary and "Running Changes Everything" is suggestive. Doc. 9 at 18–19. Nike asserts that CE and RCE are not valid marks because they are descriptive, rather than distinctive, and they lack secondary meaning. Doc. 34 at 17–18.

As is relevant here, "[d]escriptive marks define a particular characteristic of the product in a way that does not require any exercise of the imagination." *George & Co.*, 575 F.3d at 394. In contrast, suggestive marks do require imagination to associate the mark with the product, and arbitrary marks "typically involve common words that have no connection with the actual product." *Id.* If the mark imparts information directly, such as "After Tan post-tanning lotion," or "5 Minute Glue," it is descriptive. *Id.* If it stands for an idea that requires some operation of the imagination to connect it with the goods, however, such as "Coppertone" or "Orange Crush," it is suggestive. *Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d 455, 464 (4th Cir. 1996). If the mark does not suggest or describe any quality, ingredient, or characteristic of the goods it serves, such as "Tea Rose® flour, Camel® cigarettes, and Apple® computers," the mark is arbitrary. *Id.*

The "Change Everything" mark is suggestive. Neither the word "change" or the phrase "change everything" directly impart information in a descriptive way about any quality, ingredient, or characteristic of Fleet Feet's goods and services; rather, it is a "more nuanced" phrase. *Dynamic Aviation*, 2016 WL 1247220, at *19. The word

"change" implies substituting or replacing one thing with something else, or altering something, and change can be good, bad, or neutral, depending on context. When used in conjunction with the word "everything" and as applied to retail sporting goods stores, T-shirts, and organizing running and walking race training events, the phrase has a positive meaning, a meaning that it does not necessarily impart when used in everyday language or without association with Fleet Feet's goods and services. As used, it suggests that Fleet Feet's services or purchase of their products will result in positive "change" of "everything," but it does not describe how or why that will happen or directly link in any descriptive way the goods and services to the way that "everything" will "change."

Certainly, races, training, and sports can be associated with self-improvement and with positive change. This intuitive link between the phrase and Fleet Feet's goods and services allows a connection between the ideas of positive change and self-improvement, on the one hand, and goods and services related to racing, training, and sports on the other. The mark is thus not arbitrary. But that connection is not descriptive, and it does "require[] some operation of the imagination" to connect this mark to Fleet Feet's running-related goods and services. *Dynamic Aviation*, 2016 WL 1247220, at *18.

For similar reasons, the mark "Running Changes Everything" is suggestive, not descriptive or arbitrary. The inclusion of the word "running" draws a somewhat straighter line between the mark and the goods and services involved, and it is more apparent how such change will occur and that it will be positive, so the mark is marginally less suggestive than "Change Everything." Even so, "Running Changes Everything" does not directly describe any information about, or quality or characteristic

of, Fleet Feet's goods and services. The mark is much less like "After Tan post-tanning lotion," or "5 Minute Glue," marks the Fourth Circuit has characterized as descriptive, *George & Co.,* 575 F.3d at 394, and much more like "Coppertone" or "Orange Crush," which it has characterized as suggestive. *Sara Lee*, 81 F.3d at 464. "Running Changes Everything" merely suggests that the products and services sold by Fleet Feet will make the runner's life better in an overall, non-specific way, and does not describe the qualities of the goods and services themselves.

Nike contended at oral argument that by seeking to register its "Running Changes Everything" mark on the Principal Register with a claim of acquired distinctiveness, *see supra* at ¶¶ 22–23, Fleet Feet has conceded the RCE mark is not inherently distinctive. However, it cites no authority for the proposition that Fleet Feet cannot claim a higher degree of distinctiveness than it asserted in its application. The cases Nike cited arise in the context of applications to be registered on the Supplemental Register, not applications for the Principal Register, and in any event those cases merely say that such applications are admissions, not that Fleet Feet is bound by the admission.[46] The Court does tend to agree with Nike that Fleet Feet's statement in the § 2(f) application is evidence that undermines Fleet Feet's current contention that the RCE mark is suggestive. But on the

---

[46] *See Weems Indus., Inc. v. Plews, Inc.*, No. 16-CV-109-LRR, 2017 WL 1364599, at *5 (N.D. Iowa Apr. 13, 2017); *Radio Channel Networks, Inc. v. Broadcast.com, Inc.*, No. 98 CIV. 4799(RPP), 1999 WL 124455, at *3 (S.D.N.Y. Mar. 8, 1999). The statute itself says that "[r]egistration of a mark on the supplemental register shall not constitute an admission that the mark has not acquired distinctiveness." 15 U.S.C. § 1095.

other hand, the USPTO did not seem to agree,[47] and while the Court has not given this much weight—given that it appears to be tentative, and the Court is not sure what evidence the USPTO had when it made this finding—it does support the other evidence of record, detailed *supra*, that the RCE mark is suggestive. Evaluating the evidence as a whole, the Court concludes that Fleet Feet is likely to succeed on its claim that the "Running Changes Everything" mark is suggestive.

The "Change Everything" and "Running Changes Everything" marks are both valid, suggestive trademarks owned by Fleet Feet. Because the marks are suggestive, Fleet Feet need not show secondary meaning. Accordingly, Fleet Feet has demonstrated a likelihood of success on the merits as to the validity of both the CE and the RCE marks.

b. <u>Likelihood of Confusion</u>

Fleet Feet must also show that it is likely to succeed on the element of a likelihood of confusion. *Lone Star Steakhouse*, 43 F.3d at 933. Fleet Feet may satisfy this element with evidence of either forward or reverse confusion. Forward confusion occurs "when the junior user attempts to trade on the senior user's goodwill and reputation," such that consumers mistakenly believe that the junior user's goods or services are "from the same source as or are connected with the senior user's goods or services." *Fuel*, 7 F. Supp. 3d at 610. In contrast, "reverse confusion occurs when the junior user's advertising and promotion so swamps the senior user's reputation in the market that customers are likely

---

[47] As best the Court can tell, the USPTO did not require evidence of secondary meaning ("acquired distinctiveness" under § 2(f)) before publishing them for objection. This indicates the examiner found the marks for these applications were at least suggestive rather than descriptive.

to be confused into thinking that the senior user's goods are those of the junior user:  the reverse of traditional confusion." 4 *McCarthy* § 23:10.[48]  In a "classic case" of reverse confusion, a plaintiff "should have little difficulty in establishing likelihood of confusion."  *MicroStrategy Inc.*, 245 F.3d at 346–47 (Niemeyer, J., dissenting).

The factors used for the confusion inquiry in the Fourth Circuit are well established:  (1) the strength or distinctiveness of the mark; (2) the similarity of the two marks to consumers; (3) the similarity of the goods or services the marks identify; (4) the similarity of the facilities the two parties use in their businesses; (5) the similarity of the advertising used by the two parties; (6) the defendant's intent; (7) actual confusion; (8) the quality of the defendant's product; and (9) the sophistication of the consuming public.[49]  *Rosetta Stone Ltd. v. Google, Inc*., 676 F.3d 144, 153 (4th Cir. 2012).  Not all of these factors are of equal importance, "nor are they always relevant in any given case."  *Anheuser-Busch, Inc. v. L & L Wings, Inc.*, 962 F.2d 316, 320 (4th Cir. 1992).  The likelihood of confusion between marks is "an inherently factual issue that depends on the unique facts and circumstances of each case."  *Id*. at 318.

---

[48] *See also A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 228 (3d Cir. 2000); *Ameritech, Inc. v. Am. Info. Techs. Corp.*, 811 F.2d 960, 964 (6th Cir. 1987) (In a reverse confusion trademark case, "[t]he public comes to assume the senior user's products are really the junior user's or that the former has become somehow connected to the latter," and that in this way, "the senior user loses the value of the trademark—its product identity, corporate identity, control over its goodwill and reputation, and ability to move into new markets."); *JFJ Toys, Inc. v. Sears Holdings Corp.*, 237 F. Supp. 3d 311, 337 n.11 (D. Md. 2017) (noting "[n]umerous lower courts . . . have considered evidence of reverse confusion within the 'likelihood of confusion' analysis" and collecting district court cases within the Fourth Circuit).

[49] Sophistication is only a factor where the relevant market is not the public at large, *George & Co.*, 575 F.3d at 400, as it is here.

Forward and reverse confusion are factually distinct ways to evaluate the likelihood of confusion. As Fleet Feet contends both exist in this case, the Court will consider them together, clarifying differences between the two as needed. *See Teal Bay Alliances, LLC v. Southbound One, Inc.*, No. MJG–13–2180, 2015 WL 401251, at *16 (D. Md. Jan. 26, 2015) (noting factors to evaluate forward and reverse confusion "are largely the same"); *Coryn Grp. II, LLC v. O.C. Seacrets, Inc.*, 868 F. Supp. 2d 468, 484–89 (D. Md. 2012) (evaluating reverse confusion claim using same factors as in forward confusion claim); *see also A & H*, 237 F.3d at 229.

### i. Strength or distinctiveness of the mark

While Fleet Feet is likely to be successful in showing its marks are distinctive, *see* discussion *supra*, the marks are not very strong. *See* discussion *infra*. While this lowers the likelihood of success on forward confusion, it conversely strengthens a finding of reverse confusion, as it increases the risk Nike's advertising will overcome Fleet Feet's marks. *See A & H*, 237 F.3d at 231.

"The strength of a mark is the degree to which a consumer in the relevant population, upon encountering the mark, would associate the mark with a unique source." *CareFirst of Md., Inc. v. First Care, P.C*., 434 F.3d 263, 269 (4th Cir. 2006). A mark's strength "is evaluated in terms of its conceptual strength and commercial strength." *Id*.

### 1. Conceptual strength

The conceptual strength inquiry "focuses on the linguistic or graphical peculiarity of the mark, considered in relation to the product, service, or collective organization to which the mark attaches." *Id*. Conceptual strength requires analysis both of whether a

mark is distinctive and how it has been used by third parties. *Id.* at 269–70. The distinctiveness of the CE and RCE marks is analyzed *supra* at 23–25. Neither mark is fanciful or arbitrary, but both marks are suggestive and thus are distinctive.

Even if the mark is distinctive, however, "[t]he frequency of prior use of a mark's text in other marks, particularly in the same field of merchandise or service, illustrates the mark's lack of conceptual strength." *CareFirst*, 434 F.3d at 270; *see also A & H*, 237 F.3d at 223 (use of a term within the relevant field is "more probative," but "the extensive use of the term in other markets may also have a weakening effect on the strength of the mark"); *Fuel*, 7 F. Supp. 3d at 611–12 (of 1,000 federal trademark registrations with the word "fuel," at least fifteen were in the same international class, and several others were for items in the same field of action sports, which "weakens the distinctiveness of Fuel's asserted mark"). Both third-party registrations and unregistered uses are relevant to considering conceptual strength, as they indicate how common the relevant terms are in the marketplace. *See Petro Stopping Ctrs., L.P. v. James River Petroleum, Inc.*, 130 F.3d 88, 93–94 (4th Cir. 1997); *Sterling Acceptance Corp. v. Tommark, Inc.*, 227 F. Supp. 2d 454, 462 (D. Md. 2002).

Nike provides a list of registered marks that include "change everything" and related phrases, Doc. 38-17, though fewer than half of those are actively used. *Supra* at ¶ 39. In addition, none are for retail fitness stores, athletic clothing, or race training, which are the areas and ways that Fleet Feet uses its marks. *Supra* at ¶¶ 10–11, 18–19, 39. There were no other registrations of "running changes everything," *supra* at ¶ 38, though

many of the registered marks shared the format of "[ ] changes everything." *See supra* note 44.

Nike also submits examples of several unregistered uses of "change everything" in the athletic field, such as a 2014 Adidas Boost sneaker commercial with "Boost Changes Everything," a 2013 sports cap commercial featuring Jackie Robinson with "First Changes Everything," and a 2018 Gatorade commercial with "Everything Changes." *See supra* at ¶ 40.  These videos end with or include prominently a still shot of the quoted tag line in large, distinct print, without surrounding text.  *Id.*  In addition, fitness-related websites have used the phrase "change everything" textually to describe their services or what they hope consumers will gain from them, such as how a 20-minute daily workout can change everything, how "keystone habits" can change everything in physical training, and how "sport and physical activity can change everything for girls."  *See supra* at ¶ 41.  The idea of "change everything" has appeared broadly in athletic advertising for some time.

Given the extensive third-party registrations and use of similar phrases in other classes, the "Change Everything" mark, while distinctive, is relatively weak.  *See, e.g.*, *Sterling*, 227 F. Supp. 2d at 462 (plaintiff's mark was weak since the word "Sterling" is used by "a large number of businesses which provide financial services, including many that [like the plaintiff] arrange for boat loans," and there were 18 USPTO registrations in the financial services class and over 350 registrations in other classes including the word).  Despite the many marks with a similar format, there are no other uses of

"Running Changes Everything," *supra* at ¶ 42, so it has slightly greater conceptual strength than "Change Everything."

Overall, the "Change Everything" mark is less likely to be associated with running or fitness, which increases its conceptual strength, yet its general nature also means it is used more often in other fields. The "Running Changes Everything" mark is somewhat less suggestive, as it has a closer connection with Fleet Feet's goods and services, but it gains conceptual strength because the phrase itself has not been registered with the USPTO by any other entities, nor is there any evidence of use by other entities. In sum, while neither mark has great conceptual strength, RCE is stronger than CE, and both are protectable without evidence of secondary meaning.

## 2. Commercial strength

"The commercial-strength inquiry . . . looks at the marketplace and asks if in fact a substantial number of present or prospective customers understand the designation when used in connection with a business to refer to a particular person or business enterprise." *CareFirst*, 434 F.3d at 269.

This analysis differs as between forward and reverse confusion. In general, "a consumer first encountering a mark with one set of goods is likely to continue to associate the mark with those goods, which makes advertising crucial: if one manufacturer "expends tremendous sums in advertising while the other does not, consumers will be more likely to encounter the heavily advertised mark first." *A & H*, 237 F.3d at 230; *Teal Bay Alliances*, 2015 WL 401251, at *16. If Fleet Feet as the senior user spends more on advertising, then forward confusion is more likely; if Nike as the

junior user spends more, however, then reverse confusion is more likely. Indeed, "the relatively large advertising and promotion of the *junior* user is the hallmark of a reverse confusion case." *A & H*, 237 F.3d at 231 (quoting 4 *McCarthy* § 23:10).

In evaluating commercial strength, courts look to six factors: "(1) the plaintiff's advertising expenditures; (2) consumer studies linking the mark to a source; (3) the plaintiff's record of sales success; (4) unsolicited media coverage of the plaintiff's business; (5) attempts to plagiarize the mark; and (6) the length and exclusivity of the plaintiff's use of the mark." *Dynamic Aviation*, 2016 WL 1247220, at *20 (quoting *George & Co.*, 575 F.3d at 395).

Nike is a far larger company, it has greater resources available for advertising campaigns like this, and it is spending a substantial sum of money on the SCE campaign: $16,000,000 so far. *See supra* at ¶¶ 3–6, 31. The "Sport Changes Everything" campaign debuted in July during nationally televised sporting events; it has continued with dozens of online videos, social media posts by prominent Nike-sponsored athletes, large public billboards, and unspecified additional content that must be significant in scope for Nike to assert a great burden to change it; and Nike intends to use the advertising campaign in some way related to the Super Bowl. *Supra* at ¶¶ 30–33; *see also* Doc. 35 at ¶ 17. While Fleet Feet's advertising expenditures are substantial, they total just a few million dollars over the last five years, *supra* at ¶ 3, and are only a fraction of the amount Nike is spending on this campaign alone. And there is nothing to indicate Fleet Feet intends or is able to advertise on television during major sporting events or at large running events like famous marathons. Nike is the junior user, but it is well on its way to becoming the more

dominant user, allowing it to overcome Fleet Feet's public association with the "Change Everything" and "Running Changes Everything" marks. *See Teal Bay Alliances*, 2015 WL 401251, at \*16 ("The commercial strength of the junior user's mark is what is more likely to lead to reverse confusion, because it is likely that the consumer's first experience with the mark was with the junior user."). Moreover, there is evidence of media coverage of SCE, *supra* at ¶ 34—which Fleet Feet contends is unsolicited press coverage, Doc. 46 at ¶ 14—and no evidence of unsolicited coverage of Fleet Feet's "Change Everything" and "Running Changes Everything" marks. Nike's greater commercial strength supports a strong likelihood of reverse confusion and decreases the risk of forward confusion.

As to the remaining factors, Fleet Feet does not show the requisite commercial strength for a likelihood of success on the merits as to forward confusion. It has offered no evidence that a consumer will see Nike's products and believe them to be Fleet Feet's. The CE and RCE marks do not typically stand alone without Fleet Feet's name or other marks alongside them (or, in the case of T-shirts, on the other side), *supra* at ¶¶ 18, 20, which weakens their independent commercial strength. *See CareFirst*, 434 F.3d at 270. Fleet Feet's advertising and revenue numbers do not indicate how much of its spending was dedicated to these marks nor what its market share may be, *see supra* at ¶¶ 3–4, and it is Fleet Feet's burden to provide such context to evaluate commercial strength. *See Fuel*, 7 F. Supp. 3d at 613–14. Fleet Feet provides no evidence of consumer studies or attempts to plagiarize the mark. Fleet Feet's use of these marks for several years, *supra* at ¶¶ 10, 18, weighs in its favor, but there is also extensive evidence of CE-related third-

party registrations in other fields and some evidence of third-party unregistered uses in athletics. *See supra* at ¶¶ 38–41. Overall, Fleet Feet's evidence of commercial strength for CE and RCE is too thin to support a finding of forward confusion—but it strongly supports a finding of reverse confusion.

In sum, Fleet Feet's "Change Everything" and "Running Changes Everything" marks are distinctive and protectable, and Nike's branding, pervasive presence, and extensive advertising of its infringing mark gives rise to a substantial risk that consumers will associate Fleet Feet's CE and RCE marks with Nike instead of with Fleet Feet. This factor tips in favor of Fleet Feet on a likelihood of reverse confusion.

## ii. Similarity of the two marks to consumers

The more similar two marks are, the greater the likelihood of confusion. *Dynamic Aviation*, 2016 WL 1247220, at *20. In assessing similarity, courts "focus on the dominant portions" of the parties' marks: "whether there exists a similarity in sight, sound, and meaning which would result in confusion." *George & Co.*, 575 F.3d at 396. In addition, "we must examine the allegedly infringing use in the context in which it is seen by the ordinary consumer." *CareFirst*, 434 F.3d at 271. This context includes the presence of other brand marks, such as Fleet Feet's name and the "flame," or Nike's name and the "swoosh." While not a bright-line rule, the likelihood of forward confusion may decrease if the allegedly infringed mark is paired with a house mark that is easily associated with the relevant user. *See id.*; *Rebel Debutante*, 799 F. Supp. 2d at 572, 573 n.7; *see also A & H*, 237 F.3d at 218–19. However, such a pairing is likely to increase the risk of reverse confusion, as the junior user's brand will thus be associated with the

senior user's mark.  *See A & H*, 237 F.3d at 229–30; *JFJ Toys, Inc.*, 237 F. Supp. 3d at 337.

The "Sport Changes Everything" mark is quite similar to the "Change Everything" and "Running Changes Everything" marks.  Both companies use these marks as stand-alone phrases ornamenting store displays, both in and outside of stores, and on banners, T-shirts, and billboards.  *See supra* at ¶¶ 11, 19, 30.  The fonts are not exactly the same: Nike's font varies in different contexts and includes but is not limited to Fleet Feet's two styles.  *Supra* at ¶¶ 12, 20, 33.  But these "graphic dissimilarities" do not "overcome the identical use" of two words across the three marks at issue, *Dynamic Aviation*, 2016 WL 1247220, at *20, particularly since the two companies display their marks in similar ways in stores, in videos, and in other contexts.  *See supra* at ¶ 33 & note 42.  And Fleet Feet's CE registration and RCE applications are based on the words, not limited to a particular visual presentation.  *Supra* at ¶¶ 14, 22, 23.  *Cf. Kelly-Brown v. Winfrey*, 95 F. Supp. 3d 350, 358 (S.D.N.Y. 2015) (Plaintiff registered a "special form" mark consisting of a particular color and script of lettering, with a disclaimer:  "No claim is made to the exclusive right to use own your power apart from the mark as shown.").

In addition, the "Sport Changes Everything" mark is commonly paired with the Nike name or "swoosh."  *See supra* at ¶ 29.  This pairing decreases the risk of forward confusion, as consumers will know that "Sport Changes Everything" belongs to Nike rather than Fleet Feet, but it increases the likelihood of reverse confusion as consumers are likely to associate Fleet Feet's similar marks with Nike instead of with Fleet Feet. While Fleet Feet's core marks usually accompany the "Change Everything" and

"Running Changes Everything" marks, *supra* at ¶¶ 12, 20, consumers who are familiar with Fleet Feet's marks and who are now exposed to Nike's extensive SCE campaign may yet think that Nike has bought Fleet Feet or otherwise be confused as to the relationship between the two companies. The frequent placement of Nike's marks next to "Sport Changes Everything" thus increases the risk of reverse confusion. This factor weighs decidedly in favor of Fleet Feet, particularly for reverse confusion.

### iii.   Similarity of the goods or services the marks identify

Both Nike and Fleet Feet sell athletic apparel and sponsor sporting events. *Supra* at ¶¶ 1–2, 5, 7. While the scale of the two companies is different, and Nike sells a wider variety of sporting goods than does Fleet Feet, *supra* at ¶ 7, the overlap is sufficient that a consumer may "attribute the products and services to a single source." *Dynamic Aviation*, 2016 WL 1247220, at *20 (quoting *Renaissance Greeting Cards, Inc. v. Dollar Tree Stores, Inc.*, 227 F. App'x 239, 244 (4th Cir. 2007)). Indeed, Fleet Feet sells dozens of Nike's goods in its stores, alongside its own T-shirts and the goods of several other vendors. *Supra* at ¶ 8. This factor favors Fleet Feet.

### iv.   Similarity of the facilities the two parties use in their businesses

This factor "seeks to determine if confusion is likely based on how and to whom the respective goods of the parties are sold." *Fuel*, 7 F. Supp. 3d at 618. Nike and Fleet Feet use overlapping methods to distribute their goods: both sell on their own online stores and in retail stores, to a similar customer base. The fact that Fleet Feet sells Nike products in its own stores—that it is a customer as well as a competitor of Nike, *supra* at ¶ 8—markedly increases the risk of confusion here.

Nike contends this factor weighs in its favor because "Sport Changes Everything" does not appear on Nike product labels sold in Fleet Feet stores, nor has Nike run the SCE campaign in Fleet Feet stores.  Doc. 34 at 24–25.  But its cited authorities do not arise in the situation that exists here, where a customer will commonly find Nike products in Fleet Feet's stores.[50]  *Supra* at ¶ 8.  Given the extensive online and other out-of-store advertising as part of the "Sport Changes Everything" campaign, *see supra* at ¶¶ 30–33, consumers may reasonably carry those ideas with them into a Fleet Feet store—where, upon seeing "Change Everything" and "Running Changes Everything" marks, they may assume that, or wonder if, Nike owns or controls Fleet Feet.  This factor favors Fleet Feet.

### v.  Similarity of the advertising used by the two parties

To compare advertising, courts examine "the media used, the geographic areas in which advertising occurs, the appearance of the advertisements, and the content of the advertisements."  *CareFirst*, 434 F.3d at 273.  Here, both Fleet Feet and Nike have a national retail presence.  *Supra* at ¶¶ 2, 5.  Both companies advertise nationally through social media and online advertising, and both use in-store displays for their respective marks.  *Supra* at ¶¶ 11, 19, 30.  Nike's television advertising for SCE's July debut reached a national audience, and while there is no direct evidence that Nike will advertise on television during upcoming major sports events, that is a reasonable inference.  *See*

---

[50] For instance, in one of the cases cited by Nike, Doc. 34 at 25, the two companies' products were both sold at "a Macy's department store in New York," but otherwise, there was generally "little overlap in the individual retail stores selling the brands."  *Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*, 507 F.3d 252, 263 (4th Cir. 2007).

*supra* at ¶ 31.  There is no evidence that Fleet Feet advertises on television, and the record is silent as to any radio or recent print advertising by either.  There is thus complete geographic overlap and substantial media overlap.  Given the similarity of goods sold, Nike's ongoing use of at least some running-related content to promote SCE, *see supra* at ¶ 37, the obvious inclusion of "running" within the term "sport," and the fact that many athletes in other sports also run, there is significant overlap between Fleet Feet's primary demographic of runners and the broader demographic of athletes targeted by Nike.  *Fuel*, 7 F. Supp. 3d at 619.

Here, the marks themselves are sometimes used as advertising, as in Nike's billboards and outside-of-store displays, so their similarity as analyzed *supra* is relevant to this factor as well.  The placement and focus of the advertisements are different:  it does not appear that Fleet Feet often uses online videos or features individual stories, *see supra* at ¶¶ 12, 20, in contrast to Nike's dozens of videos posted on YouTube.  *Supra* at ¶¶ 30, 32.  But the in-store displays, particularly of "Running Changes Everything" and "Sport Changes Everything", are markedly similar.  *Supra* at ¶ 33 & note 42.  Nike cites no authority to support its contention that the parties' in-store advertisements running "in their respective stores" are irrelevant for this factor.  Doc. 34 at 25.  Finally, online advertisements commonly pair both parties' marks with photographs of athletes, including runners.  *See supra* at ¶ 33 & note 42.

Given the significant overlap in the media used, the appearance of the advertisements, and the content of the advertisements, and the complete overlap in the geographic areas in which advertising occurs, this factor favors Fleet Feet.

### vi. Defendant's intent

For reverse confusion, the question of intent is "whether the junior user adopted the infringing mark knowing, or recklessly disregarding, the senior user's mark—not whether the junior user intended to trade on the senior user's goodwill and reputation." *Coryn Grp. II*, 868 F. Supp. 2d at 487–88. In other words, this factor asks whether the junior user is "at fault for not adequately respecting the rights of the senior user." 4 *McCarthy* § 23:10 (collecting cases). As the companies are longstanding partners and competitors, many Nike employees were certainly aware of Fleet Feet's use of the "Change Everything" and "Running Changes Everything" marks before the "Sport Changes Everything" campaign started. *Supra* at ¶ 28. While the record does not reflect whether Nike did a trademark search in advance of the campaign, the Court infers Nike likely did so, *supra* at ¶ 28, and such a search would have turned up the "Change Everything" mark. Fleet Feet promptly communicated its concerns to Nike upon discovering the campaign, including a cease-and-desist letter. *Supra* at ¶ 36. Although Nike changed the SCE campaign for the Chicago and New York City marathons, Nike continued the campaign overall and retained some running content. *Supra* at ¶ 37. This factor weighs in favor of Fleet Feet on reverse confusion.

For forward confusion, "[t]he intent of a junior user is relevant only if the junior user intended to capitalize on the good will associated with the senior user's mark." *CareFirst*, 434 F.3d at 273. Fleet Feet has not presented any evidence that Nike intended to capitalize on Fleet Feet's good will. It points only to Nike's apparent failure to conduct a trademark search, but that is insufficient to show such intent, "because

knowledge of another's goods is not the same as an intent to mislead and to cause consumer confusion." *George & Co.*, 575 F.3d at 398. As the record does not support this form of intent, this factor weighs in favor of Nike for forward confusion.

### vii. Actual confusion

Fleet Feet is not required to demonstrate actual confusion in order to show a likelihood of confusion. *Lone Star Steakhouse*, 43 F.3d at 933. But the lack of *any* indication of confusion, particularly given the broad reach of Nike's campaign thus far, calls its existence into question. While Nike's campaign began in July, and the complaint was filed at the end of August, Fleet Feet's filings in conjunction with the pending motion include information that is updated through the end of October. *See, e.g.*, Doc. 46 at ¶¶ 4–6 (tallying the number of Nike's SCE videos posted online and the total number of views). As there is no evidence of actual confusion occurring during these several months, this factor weighs in favor of Nike.

### viii. Quality of the defendant's product

There is no evidence that Nike's and Fleet Feet's goods differ in quality, and neither party addressed this factor substantively. The Court gives this factor no weight.

### ix. Conclusion as to Likelihood of Confusion

Weighing the relevant factors, the Court concludes that Fleet Feet has met its burden to show a likelihood of reverse confusion, but not of forward confusion. As summarized *supra*, the evidence is almost non-existent that consumers would connect Nike's products with Fleet Feet, rather than with Nike. But the evidence is strong that

consumers may come to associate Fleet Feet's marks, and thus its services and products, with Nike, not with Fleet Feet.

Fleet Feet's distinctive "Change Everything" and "Running Changes Everything" marks have relatively low commercial strength, Fleet Feet's substantial advertising expenditures are a drop in the bucket compared to Nike's spending, and Nike's advertising campaign using the "Sport Changes Everything" phrase is likely to swamp Fleet Feet's marks in the market and to cause consumers to link Fleet Feet's marks with Nike. The similarity of the marks, the advertising, and the facilities and the intent factors weigh in favor of Fleet Feet on reverse confusion. While the lack of any evidence of actual confusion favors Nike, that does not outweigh the other factors. The risk of reverse confusion is especially strong since the campaign is wide-ranging and ongoing; it will last, absent an injunction, through the upcoming holiday shopping season and many major sporting events, exposing many more consumers to Nike's "Sport Changes Everything" mark.

    c.  Fair use

Although Fleet Feet has demonstrated a likelihood of reverse confusion, Nike could "escape liability by establishing the elements of fair use" as an affirmative defense. *Tassel Ridge Winery, LLC v. Woodmill Winery, Inc*., No. 5:11–cv–00066–RLV–DSC, 2013 WL 5567505, at *6 n.7 (W.D.N.C. Oct. 9, 2013). Ultimately, Nike must prove that SCE "(1) was not used as a trademark or to indicate the source of the goods; (2) was used descriptively, only in order to describe its own goods; and (3) was used in good faith." *Id.* at *10 (citing 15 U.S.C. § 1115(b)(4); *KP Permanent Make-Up, Inc. v. Lasting*

*Impression I, Inc.*, 543 U.S. 111, 118 (2004)).  At the preliminary injunction stage, upon

Fleet Feet's showing of a valid mark and likelihood of confusion, Nike must point to

evidence which undermines Fleet Feet's ultimate likelihood of success on the merits, and

a conclusory assertion of fair use will not defeat Fleet Feet's showing.

     The first requirement for the fair use defense is that Nike is not using "Sport

Changes Everything" to "identify the source or origin of its own goods or distinguish its

goods from the goods of its competitors."  *Tassel Ridge*, 2013 WL 5567505, at *10.

"Possible indicators of trademark use include whether Defendant used the term as a

symbol to attract public attention, or whether Defendant took precautionary measures in

labeling its goods to ensure that the term would not appear to be used or understood as a

trademark."  *Id.*  Here, the size and manner of use of the "Sport Changes Everything"

mark, its similarity in appearance and font to Nike's core marks, and the attempt to "build

a commercial association" between Nike and SCE would indicate trademark use.  *Id.*

     Nike uses "Sport Changes Everything" as a mark—and, in some contexts, uses it

in a similar manner to its core "Just Do It" mark.  *Supra* at ¶ 29 & note 33.  In

advertising, Nike uses the SCE phrase in a prominent way:  it stands out visually, as a

reasonable consumer would expect of a brand identifier.  *See supra* at ¶ 33.  In addition,

the Nike name, "swoosh" symbol, or both are almost always placed near the SCE words,

*supra* at ¶ 29, linking the phrase to Nike in context, and Nike has not taken steps to

decrease this tendency.  In high-profile placement of the SCE campaign as part of major

televised sporting events and otherwise, Nike has used the phrase in clear association

with the Nike brand.  *Supra* at ¶¶ 30–33.  While Nike also uses the phrase textually to some extent, that is not inconsistent with its concomitant use as a trademark.

Nor does Nike use "Sport Changes Everything" descriptively, as it does not merely describe the goods Nike is selling.  Nike contends SCE describes the campaign itself, Doc. 34 at 16, but Nike's internal use of the phrase is not the applicable test: courts evaluate the descriptive character of a challenged mark in relation to the goods or services at issue.  *See Tassel Ridge*, 2013 WL 5567505, at *6 n.7, *11 (descriptive character of mark is evaluated in fair use context in the same way as in the conceptual strength context); *see also* 15 U.S.C. § 1115(b)(4) (fair use applies for use "of a term or device which is descriptive of and used fairly and in good faith *only to describe the goods or services of such party*, or their geographic origin") (emphasis added).  As with Fleet Feet's marks, it "requires some operation of the imagination" to connect "Sport Changes Everything" with Nike's goods, which renders SCE at least suggestive rather than descriptive.  *Dynamic Aviation*, 2016 WL 1247220, at *18.

Finally, Nike's evidence of good faith is not compelling.  As noted *supra*, if Nike failed to conduct a trademark search in advance of its SCE campaign, that does not itself constitute bad faith, *see Tassel Ridge*, 2013 WL 5567505, at *12 (bad faith analyzed for fair use in same way as for the intent factor in likelihood-of-confusion analysis), and it does not appear Nike intended to confuse the public by using SCE.  *See id.*  But it has not denied that many of its employees work closely with Fleet Feet and were aware of its marks, *see supra* at ¶ 28, which is relevant for reverse confusion.  In any event, even if

43

Nike acted in good faith, that is not enough by itself to establish the fair use defense, and the other elements are not, as discussed *supra*, supported by the record.

Nike's weak evidence in support of the fair use defense does not undermine Fleet Feet's likelihood of success on the merits.

## II.     Risk of Irreparable Harm

In addition to demonstrating a likelihood of success on the merits, Fleet Feet must "make a clear showing that it is likely to be irreparably harmed absent preliminary relief." *Real Truth about Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 347 (4th Cir. 2009), *vacated on other grounds*, 559 U.S. 1089 (2010), *reinstated in relevant part*, 607 F.3d 355 (4th Cir. 2010). "When the failure to grant preliminary relief creates the possibility of permanent loss of customers to a competitor or the loss of goodwill, the irreparable injury prong is satisfied. Irreparable harm must be 'actual and imminent' and not 'remote' or 'speculative.'" *Dynamic Aviation*, 2016 WL 1247220, at *27. "Blanket claims" that the plaintiff will lose goodwill absent an injunction will not suffice, but "where a plaintiff can demonstrate that it faces commercial harm that cannot be adequately compensated with monetary damages, that plaintiff carries his burden on this factor." *Id.* at *28.

An injunction is the standard remedy in a trademark infringement case, *see* 5 *McCarthy* § 30:1, as it protects the infringed parties' right in their trademark and maintains the status quo. *Microsoft*, 333 F.3d at 525; *Dep't of Parks & Rec. for California v. Bazaar Del Mundo Inc.*, 448 F.3d 1118, 1124 (9th Cir. 2006); *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 196–97 (3d Cir. 1990).

44

Given Nike's market power, online and social media presence, and the wide-ranging placement of the "Sport Changes Everything" campaign in stores, billboards, and otherwise, Fleet Feet has shown it is likely to be irreparably harmed if Nike is permitted to continue the campaign through the holiday season and the Super Bowl. The more consumers see "Sport Changes Everything" before they see Fleet Feet's similar marks, the more likely it is they will "come to assume" that Fleet Feet's products are really Nike's or to associate all three marks with Nike. *Fuel*, 7 F. Supp. 3d at 610 (describing how reverse confusion causes harm); *see also A & H*, 237 F.3d at 228. This confusion is difficult to quantify, and Nike has not suggested any way that Fleet Feet could be made whole if it ultimately prevails. And given that Nike intends to use "Sport Changes Everything" only until February 2020, *supra* at ¶ 31, any permanent injunction would issue after the campaign has ended and thus would not protect Fleet Feet's rights. *See Kraft Foods Grp. Brands LLC v. Cracker Barrel Old Country Store, Inc.*, 735 F.3d 735, 741 (7th Cir. 2013) (noting, in affirming a preliminary injunction, that "irreparable harm is especially likely in a trademark case because of the difficulty of quantifying the likely effect on a brand of a nontrivial period of consumer confusion (and the interval between the filing of a trademark infringement complaint and final judgment is sure not to be trivial)"). The level of reverse confusion at issue here, the difficulty of quantifying such harm, and the timing all support a finding in favor of Fleet Feet on this factor.[51]

---

[51] The Fourth Circuit has not yet decided whether the presumption of irreparable harm still applies in a trademark case after *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006), though many district courts in this Circuit continue to apply the presumption. *See Turn & Bank*

Nike asserts Fleet Feet delayed in seeking a preliminary injunction, noting that Fleet Feet became aware of Nike's SCE campaign by at least mid-July, filed suit on August 30, and filed the pending motion on September 19.  Doc. 34 at 13.  But it is reasonable for a litigant to get its ducks in a row before coming to court, and a litigant should not be punished for giving itself time to investigate and prepare its case, so long as it does so expeditiously.  It also appears the parties were attempting to avoid the need for litigation for at least some of this time, *see supra* at ¶ 36, and "the goal of voluntary resolution of disputes" balances against a finding of undue delay.  *Rebel Debutante*, 799 F. Supp. 2d at 580.  While Nike contended at oral argument that Fleet Feet was merely attempting to perfect its trademarks by filing applications with the USPTO, the Court has given very little weight to the recent activity at the USPTO.  Moreover, this delay is far shorter than in other cases where courts have not found timing to militate against granting a preliminary injunction.  *See Dynamic Aviation*, 2016 WL 1247220, at *29 (citing cases finding irreparable harm with six- and eight-month delays before filing suit).  Particularly given the longstanding business relationship between the parties, it was reasonable to investigate and to try negotiation before filing suit.

Nike also asserts Fleet Feet has presented no evidence its revenue has begun to decline or that its franchisees are leaving due to the SCE campaign.  Doc. 34 at 13–14.  But this form of harm takes time to rise to the surface.  Moreover, at least one franchisee

---

*Holdings, LLC v. Avco Corp.*, No. 1:19-CV-503, 2019 WL 4773667, at *11–12 & n.9 (M.D.N.C. Sept. 30, 2019) (noting the question and citing cases).  The Court need not resolve this question because the facts in this case support an independent finding of irreparable harm.  *Dynamic Aviation*, 2016 WL 1247220, at *28 n.18.

saw the SCE campaign and promptly contacted Fleet Feet, *see* Doc. 13, indicating franchisee concern over protecting these marks and whether the franchisee is getting value for its money.

In the absence of a preliminary injunction, Fleet Feet's property rights will be irreparably harmed.

III.     Balance of Equities

The balance of the equities favors Fleet Feet. Absent a preliminary injunction, Fleet Feet will essentially be without a remedy if it wins the case, given the SCE campaign's planned end point. Much of the advertising the Court has seen can be modified to delete the infringing use and still be used. While Nike asserts it will need to adjust the SCE campaign significantly if an injunction issues—"hundreds if not thousands of hours of work and many millions of dollars would be wasted," Doc. 35 at ¶ 17—it provides no specific evidence of how much it would cost going forward to make such changes. *See* Doc. 34 at 28.

Nike also contends it may not be able to replace the campaign at all before the end of the season, Doc. 35 at ¶ 17, but this conclusory evidence shows only uncertain harm.[52] There is no evidence that all of Nike's advertising uses the SCE mark, and it strains credulity to think that a company with the size and sophistication of Nike has no other advertising available to use during the holidays. And this short-term harm to Nike is less

---

[52] However, Nike may continue to use SCE to promote and in connection with the Chicago Elite Classic in Chicago on December 6–7, 2019, in view of the shortness of time and the fact that it is a local, not national, basketball tournament. *See* Doc. 61 at 2.

acute than the ongoing and concrete damage Fleet Feet will experience if Nike is permitted to continue the high-visibility use of the SCE mark during a particularly commercialized time of year and at the Super Bowl. Fleet Feet risks having its marks swamped due to the continued public association between Nike and a mark that is so similar to Fleet Feet's, as analyzed *supra*. Finally, Nike had the option to perform a trademark search in advance—or, if it did one, to respond differently—to ensure its planned campaign would appropriately respect other companies' marks and would not be subject to court action.

IV.     Public Interest

"There is a strong public interest in preventing trademark infringement. Indeed, the purpose of a trademark is to protect the public from confusion about the identity of the enterprise from which goods and services are purchased." *Rebel Debutante*, 799 F. Supp. 2d at 581. Nike may still share uplifting stories of athletes whose lives and communities have been improved by their involvement in sports, but they may not do so in a way that infringes on Fleet Feet's protectable marks. Contrary to Nike's argument, *see* Doc. 34 at 29, changing the SCE mark does not prevent Nike from engaging in ongoing charitable campaigns. An injunction against Nike's ongoing use of the SCE mark will protect the public from further confusion about the source of Fleet Feet's goods.

V.     Bond

Rule 65(c) specifies that a "court may issue a preliminary injunction . . . only if the movant gives security." Fed. R. Civ. P. 65(c); *Pashby*, 709 F.3d at 331–32. The Court

has the discretion to set the bond amount as it sees fit or waive the security requirement. *Pashby*, 709 F.3d at 332; *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 (4th Cir. 1999).

The Court must determine the amount of a bond based on record evidence. *Lab. Corp. of Am. Holdings v. Kearns*, 84 F. Supp. 3d 447, 465 (M.D.N.C. 2015). "The burden of establishing the bond amount rests with the party to be restrained, who is in the best position to determine the harm and will suffer from a wrongful restraint." *Id.* And in setting the bond amount, the court "should be guided by the purpose underlying Rule 65(c), which is to provide a mechanism for reimbursing an enjoined party for harm it suffers as a result of an improvidently issued injunction." *Hoechst*, 174 F.3d at 421 n.3. Ordinarily, then, the amount of the bond "depends on the gravity of the potential harm to the enjoined party." *Id.*

The parties have said little about an appropriate security. Nike contends any bond should be no less than $16,000,000, the amount it has already spent on the SCE campaign, Doc. 30 at 29, while Fleet Feet notes Nike's lack of evidence offered to support how much it would cost to remove the SCE mark and still use the remainder of the already-developed promotional materials. Doc. 44 at 16. Nike should be able to estimate this amount given its previous efforts to rework the SCE campaign for use at the New York and Chicago marathons, *see supra* at ¶ 37, but it has not met this burden. To the extent Nike contends it will not be able to use any of its already-developed advertising, the record does not support that contention, nor is the evidentiary basis

sufficient to set the bond at the level Nike requests.  *See* 11A Charles Allen Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2954 (3d ed. 2019).

No doubt, however, the injunction will cost Nike money, and the injunction will cause Nike significant problems with its campaign.  A substantial bond is appropriate.  Accordingly, the Court will set bond at $1,000,000.  Should Nike wish to seek a higher amount, it may file a motion to increase the security, accompanied by additional evidentiary support.

### Conclusion

Fleet Feet has met its burden to obtain a preliminary injunction.  Fleet Feet has demonstrated that it is likely to succeed on the merits.  Its "Change Everything" and "Running Changes Everything" marks are both valid and protectable.  While there is not much evidence of forward confusion, Fleet Feet has shown a strong likelihood of reverse confusion, as Nike's large multimedia "Sport Changes Everything" campaign is likely to overcome public association between Fleet Feet and its "Change Everything" and "Running Changes Everything" marks.  Fleet Feet is also likely be irreparably harmed without a preliminary injunction, since Nike's SCE seasonal use of the SCE mark will damage Fleet Feet's trademark interests further and Fleet Feet's interests will not be protected by a permanent injunction which issues after the advertising campaign is over.  Although Nike contends that it would cost significant resources to redo the campaign at this stage, it has provided only conclusory evidentiary support.  For these reasons, the balance of equities tips in favor of Fleet Feet.  The public interest in enforcing trademark rights and preventing public confusion also lies with Fleet Feet.

It is **ORDERED** that the plaintiff's motion for preliminary injunction, Doc. 8, is

**GRANTED**.  The injunction will issue separately.

This the 2nd day of December, 2019.

UNITED STATES DISTRICT JUDGE